1  T. STEVEN GREGOR (SBN 185707)
   GREGOR LAW OFFICES
2  2550 Fifth Avenue, Suite 709
   San Diego, CA 92103
3  Telephone:  (619) 238-2700
   Facsimile:  (619) 330-4748
4  Email:  sgregor@gregorlawoffices.com

5  Attorneys for Plaintiffs,
   ROBERT NAMER, IAR COMPANY,
6  BUSINESS MANAGEMENT INFORMATION
   SYSTEM, INC., and AMERICAN ACADEMY
7  OF POOL DESIGNERS, INC.

8

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13  ROBERT  NAMER,  IAR  COMPANY,  )   CIVIL ACTION NO.:  3:16-cv-
                                    )   03024-JM-WVG
14  BUSINESS MANAGEMENT            )
    INFORMATION SYSTEM, INC., and  )
15  AMERICA  ACADEMY  OF  POOL     )   **THIRD AMENDED COMPLAINT**
    DESIGNERS, INC.;               )   **FOR:**
16                                 )
17        Plaintiffs,              )   **(1)BREACH OF CONTRACT;**
                                   )   **(2) AIDING AND ABETTING**
18  v.                             )   **BREACH OF FIDUCIARY**
                                   )   **DUTY;**
19  BANK OF AMERICA, N.A., and DOES )  **(3)BREACH OF FIDUCARY**
20  1-100,                         )   **DUTY; AND**
    Inclusive,                     )   **(4)  AIDING AND ABETTING**
21                                 )   **CONVERSION**
22        Defendants.              )
                                   )   **DEMAND FOR JURY TRIAL**
23  _____ )

24

25

26

27

28

---

1

THIRD AMENDED COMPLAINT

Plaintiffs Robert Namer, IAR Company, Business Management Information System, Inc., and American Academy of Pool Designers, Inc. (collectively, "Plaintiffs") allege as follows:

1.   Plaintiff, Robert Namer ("Namer") is a citizen and resident of the State of Louisiana, Parish of Jefferson.  Namer also owns property and resides part-time in San Diego County, California.

2.   Plaintiff, IAR Company ("IAR") is a Nevada corporation qualified to conduct and conducting business in Metairie, Louisiana.

3.   Plaintiff, Business Management Information System, Inc. ("BMIS") is a Nevada corporation qualified conduct and conducting business in Metairie, Louisiana.

4.   Plaintiff, American Academy of Pool Designers, Inc. ("AAPD") is a Nevada corporation qualified to conduct and conducting business in Metairie, Louisiana.

5.   Plaintiffs are informed and believe, and based thereon allege, that Defendant, Bank of America, N.A. ("BOA") is and was at all times mentioned herein a national banking association within the meaning of the National Bank Act, 12 U.S.C. 21, et seq., without a state of legal incorporation, and was authorized to conduct and was conducting business in the State of California, County of San Diego.

6.   The true names and capacities of Defendants DOES 1 through 100, inclusive, whether individual, corporate, associate, or otherwise, are at this time unknown to Plaintiffs.  Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned, each of the Defendants sued herein as a DOE, whether individual, corporate, associate, or otherwise, is in some way liable or responsible to Plaintiffs on the facts hereinafter alleged, and caused injuries and damages proximately as hereinafter alleged.  At such time as such Defendants' true names become known to Plaintiffs, Plaintiffs will seek leave of court to amend this

Complaint to insert their true names and capacities.  Plaintiffs are further informed and believe and based thereon allege that at all times pertinent to this Complaint, said DOE Defendants, and each of them were individuals, business entities, and/or organizations residing and/or conducting business in the county of San Diego, state of California.

7.   Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned, each of the Defendants was the agent, servant, employee, and/or alter ego of each of the other Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of said agency and/or employment, and with the permission and consent, express and/or implied, of the other Defendants herein, and each of them, with respect to all matters referred to herein.

8.   Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned, a unity of interest exists between the Defendants such that there is no distinction between the individual Defendants named herein and the entities and if the acts alleged herein against the entities are treated as the acts of entities alone, an inequitable result will follow.  Defendants have utilized this alter ego relationship in an effort to commit the wrongs against Plaintiffs as alleged herein.  As a result, and in order to effect justice herein, the corporate fiction maintained by Defendants must be pierced, and all relief and damages should be awarded against all Defendants jointly and severally.

## JURISDICTION AND VENUE

9.   Each of the defendants named herein was residing in and/or was doing business in the County of San Diego, California at the time the acts alleged herein occurred. Each Defendant's contact with California is and was, at all relevant times, substantial, consistent, and systematic. In addition, the agreements alleged herein were entered into and the tortious conduct alleged herein occurred in the County of San Diego, California.  Further, the damages as alleged herein occurred in and were caused by Defendants' wrongful conduct, which was directed at

THIRD AMENDED COMPLAINT

Plaintiffs within San Diego County, California.  The amount in controversy in this action exceeds the jurisdictional minimum of this Court.  Accordingly, jurisdiction and venue in this Court are proper.

## FACTS COMMON TO ALL CLAIMS

10.  At all times relevant to these proceedings, and up until December 31, 2014, Plaintiff Robert Namer was the legally-elected Chairman of the Board, CEO and President of IAR; Blue Haven National Holdings, Inc.; Blue Haven National Development, Inc.; Blue Haven National Management, Inc.; Blue Haven Supplies Direct, Inc.; P & A Holdings, Inc.; Golden State Industries, Inc.; BH DFW, Inc.; BH Pools of Houston, Inc.; Blue Haven Pools of Louisiana, Inc.; BMIS; AAPD; and PVI (collectively the "Customer Companies").

11.  At all times relevant to these proceedings, and up until December 31, 2014, Plaintiff Robert Namer was, legally, both an officer and a director of each of the Customer Companies.

12.  At all times relevant to these proceedings, and up until December 31, 2014, in addition to holding the aforementioned leadership positions with the Customer Companies, Namer was the majority owner  (51%) of IAR and Blue Haven National Holdings, Inc., and the holder of an irrevocable 51% proxy in ANRB.

13.  In approximately January 2010, a senior vice president, a vice president, and an account manager for BOA met with Namer in his office in San Diego, California and verified that Namer in fact held the positions and interests in the Customer Companies as alleged above and were provided with documentation reflecting the same.  Thereafter, these individuals met with Namer in his San Diego office on multiple occasions with the understanding and knowledge that Namer was the person in control of and the person with the authority to act on behalf of each of the Customer Companies.

THIRD AMENDED COMPLAINT

14. Subsequent to December 31, 2014, and currently, Namer is the sole owner of IAR, which in turn owns BMIS, AAPD, and POOL Vision, Inc. ("PVI").

15.  At all times relevant to these proceedings, and up until December 31, 2014, Namer's minority partner (49%) in the ownership of IAR and BHNH was R'Nelle Lahlou ("Lahlou").

16.  Upon information and belief, subsequent to December 31, 2014, Lahlou is an officer and director of Blue Haven National Holdings, Inc.; Blue Haven National Development, Inc.; Blue Haven National Management, Inc.; Blue Haven Supplies Direct, Inc.; BH DFW, Inc.; BH Pools of Houston, Inc.; P& A Holdings, Inc.; and Golden State Industries, Inc.

17.  At all times relevant to these proceedings, IAR was a customer of BOA, with account no. XXXXXX6318.

18.  At all times relevant to these proceedings, Namer was a lawful signatory on IAR's BOA account no. XXXXXX6318.

19.  At all times relevant to these proceedings, BMIS was a customer of BOA, with account no. XXXXXX9178.

20.  At all times relevant to these proceedings, Namer was a lawful signatory on BMIS's BOA account no. XXXXXX9178.

21.  At all times relevant to these proceedings, AAPD was a customer of BOA, with account no. XXXXXX9173.

22.  At all times relevant to these proceedings, Namer was a lawful signatory on AAPD's BOA account no. XXXXXX9173.

23.  At all times relevant to these proceedings, Blue Haven National Holdings, Inc. was a customer of BOA, with account no. XXXXX8036.

24.  At all times relevant to these proceedings, Namer was a lawful signatory on Blue Haven National Holdings, Inc.'s BOA account no. XXXXX8036.

25. At all times relevant to these proceedings, Blue Haven National Development, Inc. was a customer of BOA, with account no. XXXXXX9192.

26.  At all times relevant to these proceedings, Namer was a lawful signatory on Blue Haven National Development, Inc.'s BOA account no. XXXXXX9192.

27.  At all times relevant to these proceedings, Blue Haven National Management, Inc. was a customer of BOA, with account no. XXXXXX9935.

28.  At all times relevant to these proceedings, Namer was a lawful signatory on Blue Haven National Management, Inc.'s BOA account no. XXXXXX9935.

29.  At all times relevant to these proceedings, Blue Haven Supplies Direct, Inc. was a customer of BOA, with account no. XXXXXX7577.

30.  At all times relevant to these proceedings, Namer was a lawful signatory on Blue Haven Supplies Direct, Inc.'s BOA account no. XXXXXX7577.

31.  At all times relevant to these proceedings, P & A Holdings, Inc. was a customer of BOA, with account no. XXXXX6548.

32.  At all times relevant to these proceedings, Namer was a lawful signatory on P & A Holdings, Inc.'s BOA account no. XXXXX6548.

33.  At all times relevant to these proceedings, Golden State Industries, Inc. was a customer of BOA, with account no. XXXXXX7683.

34.  At all times relevant to these proceedings, Namer was a lawful signatory on Golden State Industries, Inc.'s BOA account no. XXXXXX7683.

35.  At all times relevant to these proceedings, BH DFW, Inc. was a customer of BOA, with account no. XXXXXX8186.

36.  At all times relevant to these proceedings, Namer was a lawful signatory on BH DFW, Inc.'s BOA account no. XXXXXX8186.

37.  At all times relevant to these proceedings, BH Pools of Houston, Inc. was a customer of BOA, with account no. XXXXXX9236.

38. At all times relevant to these proceedings, Namer was a lawful signatory on BH Pools of Houston, Inc.'s BOA account no. XXXXXX9236.

39. At all times relevant to these proceedings, Blue Haven Pools of Louisiana, Inc. was a customer of BOA, with account no. XXXXXX5910.

THIRD AMENDED COMPLAINT

40. At all times relevant to these proceedings, Namer was a lawful signatory on Blue Haven Pools of Louisiana, Inc.'s BOA account no. XXXXXX5910.

41. As of September 6, 2013, BOA was aware that Namer was and for years had been the president of the Customer Companies, by virtue of BOA previously verifying Namer's position and president and because the signature cards for each of the subject accounts (hereinafter, the "Customer Company Accounts") listed Namer as being president.

42. Upon information and belief, the only written materials that BOA ever provided to Namer in connection with the Customer Company Accounts were the signature cards for each such account.

43. Upon information and belief, BOA never gave the terms and conditions for the Customer Companies' accounts to Namer in writing, nor did they ever explain those terms and conditions to him.

44. Upon information and belief, the terms and conditions for the Customer Companies' accounts were and/or are adhesionary in nature. At no time did Namer expect or believe that BOA could, or would, take unilateral action to remove him from the subject accounts.

45. At no time did Namer sign any document acknowledging receipt of or approval of the terms and conditions for the subject accounts.

46. Upon information and belief, from November of 2008 until approximately September 2013 BOA was aware that all financial and banking decisions involving the Customer Companies were made by Namer, including but not limited to opening and closing accounts, disbursal of funds, taking loans out, and purchasing financial products from BOA.

47. From November of 2008 until approximately September 2013 BOA knew that Namer was the primary contact person for the Customer Companies' accounts at BOA.  BOA also knew that the Customer Companies were all interrelated and all had accounts with BOA.  BOA further knew that Namer was the Chairman of

the Board, CEO, and President of the Customer Companies, the majority owner of IAR and Blue Haven National Holdings, held a 51% irrevocable proxy in ANRB. As such, it was reasonably foreseeable that BOA's failure to act with reasonable care in connection with its dealings with the Customer Companies and Namer and/or that BOA's failure to discharge its contractual duties with reasonable care would cause harm to the Customer Companies, including but not limited to IAR, BMIS, and AAPD ("Corporate Plaintiffs") and to Namer personally.

48. On or about September 4, 2013, Namer's business partners, Lahlou, Lahlou's father, Alvin Eisman ("Eisman"), and others set into motion an illegal corporate takeover of the Customer Companies, by holding a secret meeting in San Diego, CA, in which Eisman and Lahlou unilaterally removed Namer from his positions at the Customer Companies, which they had no legal right to do and which was invalid.

49. To date, there has never been a final judicial determination that Namer was not the majority owner of IAR and BHNH and the majority proxy-holder for ANRB, or that he was not the legally-elected Chairman of the Board, CEO and President of IAR; Blue Haven National Holdings, Inc.; Blue Haven National Development, Inc.; Blue Haven National Management, Inc.; Blue Haven Supplies Direct, Inc.; P & A Holdings, Inc.; Golden State Industries, Inc.; BH DFW, Inc.; Blue Haven Pools of Louisiana, Inc.; BMIS; and AAPD.  Further, Lahlou's and Eisman's purported removal of Namer from the Customer Companies was never ratified by any final judicial determination.

50. On or about September 6, 2013, Eisman, who BOA knew was not a signatory on any of the Customer Company Accounts, and Lahlou put the rest of their takeover plan into full effect, calling Namer at his offices in Metairie, Louisiana and informing him that they had (supposedly) removed him from his positions at the Customer Companies and, unbeknownst to Namer, instructed BOA

to remove Namer as an authorized signer from the Customer Company Accounts. September 6, 2013 was a Friday.

51. On Monday September 9, 2013, at Namer's first opportunity to do so, Namer sent an email to Jeff Schwartz ("Schwartz"), a Vice President / Client Manager at BOA's branch located at 450 B Street, Suite 1500, San Diego, CA 92101, advising him that there had been a hostile and fraudulent takeover of the Customer Companies by Lahlou and Eisman and requesting that all accounts be frozen immediately until a court order could be issued.

52. In response to Namer's September 9, 2013 letter, Schwartz assured Namer that his name would not be removed from the Customer Company Accounts and that the dispute with Lahlou and Eisman was a matter for the courts to decide.

53. For years prior to September 6, 2013, Namer had frequently dealt with Schwartz on financial and banking matters related to the Customer Company Accounts.  As such, Schwartz  and Namer were well acquainted with each other, Schwartz knew Namer's positions at the Customer Companies, knew that Namer controlled the operations of the Customer Companies, and knew that Namer was the bank's primary contact person for the Customer Company Accounts.  Indeed, Namer had Schwartz's email address, so that Namer could more conveniently conduct banking business with BOA on behalf of the Customer Companies.  As a result of this business relationship that had existed for years, Namer trusted Schwartz and had no reason to doubt Schwartz's assurances that the monies held in the Customer Company Accounts were safe and would not be depleted by Eisman and Lahlou.

54. Notwithstanding Schwartz's assurances and representations to Namer, BOA's frequent business dealing with Namer on many occasions regarding the Customer Company Accounts, BOA's knowledge of Namer's position with the Customer Companies, BOA's knowledge that Namer was the primary contact for the customer Company Accounts, BOA's knowledge that Eisman was not an

THIRD AMENDED COMPLAINT

authorized signatory on any of the Customer Company Accounts, and notwithstanding the fact that neither Schwartz nor anyone else at BOA had ever dealt with Lahlou regarding the Customer Company Accounts,  and that BOA knew that Lahlou's authority to act on behalf of the Customer Companies was very limited, as herein after alleged, BOA followed Eisman's and Lahlou's instructions to remove Namer from all twelve Customer Company Accounts, without notifying Namer of those instructions.

55. On or about September 12, 2013, Namer learned that that he had been removed from the Customer Company Accounts as an authorized signer, notwithstanding Schwartz's assurances that he would not be removed as an authorized signer.  Immediately after learning this, Namer, on his own behalf and on behalf of the Customer Companies, sent Schwartz a demand notice, requesting immediate restoration of his signing power, access to, and ability to borrow funds against the subject accounts.  Neither Schwartz nor any other employee of or agent for BOA complied with Namer's demand notice.  Instead, on or about September 16, 2013, in response to a follow-up email from Namer regarding the September 12, 2013 demand notice, Schwartz emailed Namer the following:

> Dear Mr. Namer,
>
> It appears that you have a legal dispute with the shareholders of the entities which maintain the deposit accounts with the Bank. This kind of dispute is properly resolved by a court; it is neither fair nor proper to demand that the bank investigate the facts, research the law, and issue the equivalent of a judgment.
>
> Therefore, we believe that the  best course is to give effect to the written instructions, given to the bank by the owners of the accounts, as to who the signatories should be on the accounts, until such time as the bank might receive a proper court order instructing otherwise.

56.  On information and belief this response was prepared and sent to Namer at the behest of Eisman.

THIRD AMENDED COMPLAINT

57. On Information and belief, at the time Eisman and Lahlou gave the directive to remove Namer from the Customer Company Accounts, BOA did nothing to verify that Lahlou was authorized to act on behalf of the Customer Companies and knew that neither Eisner nor Lahlou were authorized to remove Namer from those Accounts.

58. On information and belief, Schwartz gave the above alleged assurances knowing that they were false, for the purpose of lulling Namer into a false sense of security and to make Namer think that Namer did not need to take further immediate action to protect the Customer Company Accounts from being pilfered by Eisman and Lahlou. On information and belief, Schwartz's lies were intended to hide the actual state of affairs with respect to the Customer Company Accounts and to delay Namer's discovery that BOA had removed Namer as an authorized signer on the subject accounts to allow Eisman and Lahlou the time and opportunity to steal the monies in those accounts without Namer knowing about those activities.  Likewise, Schwartz's September 16, 2013 email to Namer and refusal to follow Namer's instructions only further helped Eisman and Lahlou to carry out their unlawful scheme.

59. Upon information and belief, BOA complied with Eisman's and Lahlou's instructions to remove Namer from the Customer Company Accounts and Eisman's directive to refuse Namer's demands to be reinstated as an authorized signer on those accounts, because Eisman held significant sums on deposit at BOA and had a long term business relationship with BOA that pre-dated Namer's business dealings with BOA.  On information and belief, BOA feared that it would lose Eisman's business, and/or that Schwartz and/or others at BOA might face other detrimental consequences, if  Eisman's directives were not followed.

60. Upon information and belief, Eisman's and Lahlou's instructions to BOA amounted to "demand[ing] that the bank investigate the facts, research the law, and issue the equivalent of a judgment," and BOA complied with those instructions.

61. In removing Namer as a signatory, BOA effectively issued "the equivalent of a judgment" in favor of Eisman and Lahlou, rather than allowing the issue to be "properly resolved by a court."

62. Contrary to Schwartz's above-quoted email, Namer had not demanded that BOA "investigate the facts, research the law, and issue the equivalent of a judgment."

63. Namer did not ask the bank to resolve his disagreements with Lahlou and/or her cohorts regarding access to and/or control over the subject bank accounts.   On the contrary, Namer had written to Schwartz on September 9, 2013, instructing him to freeze all accounts pending a court order, which Schwartz and BOA failed to do. Namer's September 9, 2013 request was the exact opposite of demanding that BOA investigate and resolve the dispute.

64. Upon information and belief, according to BOA's own policies, as articulated by Schwartz, BOA should have frozen the subject accounts when Namer demanded that it do so, in order for the matter to be "properly resolved by a court."

65. Upon information and belief, BOA's actions not only violated their own policies, they violated the accepted practices of the banking industry.

66. Another national bank which also held funds on deposit for the Customer Companies was presented with the same written instructions from Lahlou, and the same letter from Namer requesting that the disputed accounts be frozen pending judicial determination. This national bank immediately froze the accounts of the Customer Companies, thus preventing the funds held on deposit for said companies from being depleted and preventing the value of their assets being diminished.

67. Upon information and belief, by failing to freeze the subject accounts upon Namer's request, BOA failed to act as a reasonably prudent bank would have acted in the same or similar circumstances.

68. Upon information and belief, by removing Namer as a signatory on the subject accounts without verifying the propriety of Lahlou's request, or notifying Namer, or giving him a chance to respond or object, BOA failed to act as a reasonably prudent bank would have acted in the same or similar circumstances.

69. BOA's failure to act as a reasonably prudent bank would have acted in the same or similar circumstances caused the Customer Companies, including but not limited to the Corporate Plaintiffs to suffer financial harm, including but not limited to impairment of their ability to conduct business by restricting cash flow diminution of the value of the assets in dispute; and depletion of the funds held on deposit.

70. BOA's actions also placed Namer in a disadvantaged position  with regard to his claims against Eisman and Lahlou and caused Namer considerable stress, anxiety, dismay, and other forms of emotional pain and suffering which affected his physical health in ways that include but are not limited to insomnia, vision problems, and frequent headaches.

71.  Upon information and belief, as a result of Eisman's and Lahlou's improper corporate takeover, the value of the Customer Companies was diminished because their bank accounts were depleted through wrongful conversion of funds, which in turn harmed Namer's financial interests.

72.  Upon information and belief, as a result of Eisman's and Lahlou's improper corporate takeover, the value of the Corporate Plaintiffs was diminished because Lahlou and/or her cohorts mismanaged the companies, caused their expenses to increase, and/or caused their revenues to decrease, and/or otherwise harmed or impaired the companies' ability to do business, which in turn harmed Plaintiff Namer's financial interests.

73.  Upon information and belief, as a result of Eisman's and Lahlou's improper corporate takeover, the value of Plaintiff IAR was diminished because

IAR was deprived of its ownership interests in one of more of the other Customer Companies, which in turn harmed Plaintiff Namer's financial interests.

74.  Upon information and belief, as a result of Eisman's and Lahlou's improper corporate takeover, the value of Plaintiff IAR was diminished because mismanagement by Lahlou and/or her cohorts caused the value of the other Customer Companies in which IAR held an ownership interest to decrease, which in turn harmed Plaintiff Namer's financial interests.

75.  The diminution in the value of the contested assets caused Namer considerable stress, anxiety, dismay, and other forms of emotional pain and suffering which affected his physical health in ways that include but are not limited to insomnia, vision problems, and frequent headaches.

76.  Namer was harmed by Lahlou and/or her cohorts being left in control of disputed funds held in the accounts in question, because some or all of the disputed funds were held in accounts belonging to companies that Namer owned and/or controlled at the time and continues to own (directly or indirectly) following the settlement of his legal disputes with Lahlou and/or her cohorts. The amounts on deposit were depleted by millions of dollars.

77.  The depletion of the funds held on deposit for Namer's companies caused Namer considerable stress, anxiety, dismay, and other forms of emotional pain and suffering which affected his physical health in ways that include but are not limited to insomnia, vision problems, and frequent headaches.

78.  Money that rightfully belonged to the Corporate Plaintiffs (and/or to Namer's other companies) was spent by Lahlou because BOA allowed her to continue to access the subject accounts even though Namer had properly called for all such accounts to be frozen pending a court determination.

79. Lahlou spending money that rightfully belonged to Namer's companies caused Namer considerable stress, anxiety, dismay, and other forms of emotional

pain and suffering which affected his physical health in ways that include but are not limited to insomnia, vision problems, and frequent headaches.

80.  Namer was harmed by Lahlou and/or her cohorts being left in control of disputed funds held in the accounts in question, because Lahlou and/or her cohorts were able to use the disputed funds to pay attorneys to carry out their campaign against Namer.

81.  Namer was harmed by Lahlou and/or her cohorts being left in control of disputed funds held in the accounts in question, because Lahlou's resulting financial advantage caused Namer to have to settle sooner than he otherwise would have; to accept a lower amount in recovery than he otherwise would have; and to relinquish his ownership and/or control interests in the Customer Companies other than IAR, BMIS, and AAPD, which he would not have done otherwise.

82.  Having to accept a reduced settlement caused Namer considerable stress, anxiety, dismay, and other forms of emotional pain and suffering which affected his physical health in ways that include but are not limited to insomnia, vision problems, and frequent headaches.

83.  Plaintiffs originally filed an action against BOA based on nearly identical facts alleged herein in the United States District Court for the Eastern District of Louisiana on July 31, 2015, which was assigned Case Number 2:15-CV-03130 (the "Louisiana District Court Action"), asserting the same or similar claims as asserted in this action including but not limited to negligence, conversion, and conspiracy against BOA.  The Louisiana District Court Action was dismissed on or about March 21, 2016 pursuant to the Court's order dismissing the action for lack of jurisdiction.   Thus, the applicable statutes of limitations were equitably tolled for at least seven months and twenty-one days while the Louisiana District Court Action was pending, thereby extending the expiration of the applicable statutes of limitation by the same amount of time.  After the Louisiana District Court Action was dismissed, Namer and BOA spent several months attempting to resolve

THIRD AMENDED COMPLAINT

Plaintiffs' claims. Namer was not represented by counsel in these negotiations.
Namer engaged in these negotiations directly with counsel for BOA.  Then, on
June 27 2016, Namer suffered a debilitating and incapacitating Thalamic
hemorrhage with a stroke and was hospitalized at East Jefferson Hospital in
Louisiana until he was discharged from that facility on July 8, 2016. While being
treated in the hospital, Namer was medicated and also suffered a staph infection.
After being discharged from the hospital, Namer was under home care and
confinement for a month until approximately August 8, 2016.  During that time,
Namer continued to be medicated, continued to have severe cognitive difficulties,
could not drive, and remained under the care of his treating physician and a speech
pathologist.  Namer continued to treat with his treating physician until
approximately September 1, 2016, and continued under the care of his speech
pathologist until approximately early April 2017.   However, Namer still has not
fully recovered from his stroke and must restrict his daily activities per his doctor's
orders, including but not limited to limiting his work hours.  He is still under the
care of his primary care physician, must take two naps a day, and continues to take
medication.  On November 14, 2016, after Namer, who solely owns and controls
IAR, BMIS, and AAPD, had sufficiently recovered from his stroke and had
diligently searched for and retained California counsel, Namer, IAR, BMIS and
AAPD filed a Complaint against BOA in in the San Diego Superior Court (San
Diego Superior Court Case No. 37-00040002-CU-BT-CTL) (the San Diego
Superior Court Action"), which was then removed to this court.  As a result of
Namer pursuing the claims asserted in the Louisiana District Court Action in that
Court, personally engaging in settlement negotiations with BOA between March
21, 2016 and June 27, 2016, and then suffering and being treated for an
incapacitating medical condition as alleged hereinabove which he still has not fully
recovered from, the statutes of limitations applicable to Plaintiffs' claims were
tolled until the filing of this action.

## FIRST CLAIM FOR BREACH OF CONTRACT
### (By IAR, BMIS, and AAPD Against BOA and DOES 1-000)

84.  The Corporate Plaintiffs incorporate and reallege paragraphs 1 through 83 above as though fully set forth in this Claim.

85. On information and belief, BMIS opened deposit account no. XXXXXX9178 with BOA on or about December 9, 2011.  On information and belief, a true and copy of BOA's California Business Signature Card and Deposit Account Documentation Signature Card evidencing that BMIS opened a deposit account with BOA on or about December 9, 2011 and evidencing that Namer was an authorized signer on that account are collectively attached hereto as **Exhibit 1** and are incorporated herein by this reference.

86. On information and belief, AAPD opened deposit account no. XXXXXX9173 with BOA on or about December 9, 2011.  On information and belief, a true and copy of  BOA's California Business Signature Card and Deposit Account Documentation Signature Card evidencing that AAPD opened a deposit account with BOA on or about December 9, 2011 and evidencing that Namer was an authorized signer on that account are collectively attached hereto as **Exhibit 2** and are incorporated herein by this reference.

87. On information and belief, IAR opened deposit account no. XXXXXX6318 with BOA on or about February 6, 2012.  On information and belief, a true and copy of  BOA's California Business Signature Card and Deposit Account Documentation Signature Card evidencing that IAR opened a deposit account with BOA on or about February 6, 2012 and evidencing that Namer was an authorized signor on that account are collectively attached hereto as **Exhibit 3** and are incorporated herein by this reference.

88. Each California Signature Card states in relevant part, "By signing below, I/we agree that this account is and shall be governed by the terms and conditions set forth in the following documents, as amended from time to time: (1) if the

1  account is a deposit account, the Deposit Agreement and Disclosures, the Business
2  Schedule of Fees . . ."

3     89. On information and belief, the "Deposit Agreement and Disclosures"
4  attached hereto as **Exhibit 4** is the Deposit Agreement and Disclosures referred to
5  in the above alleged California Signature Cards and was in effect when Eisman and
6  Lahlou requested that Namer be removed as an authorized signer from the
7  Customer Company Accounts (the "Deposit Agreement").

8     90. The Deposit Agreement provides an authorized signer on an account may
9  ***close*** an account without the consent of any other authorized signer, but it does not
10  permit one account signer to remove another account signer from that account.

11     91. The Deposit Agreement further provides that only an ***account holder*** may
12  request the removal of any account holder or authorized signer.

13     92. The Deposit Agreement does not authorize or permit BOA to remove an
14  authorized signer from any account, unless such request was made by an ***account***
15  ***holder***.

16     93. The Corporate Plaintiffs were the account holders under the Deposit
17  Agreement.

18     94. Neither Esiner nor Lahlou were account holders under the Deposit
19  Agreement.

20     95. Prior to and on September 6, 2013, BOA knew that Namer was authorized
21  to act on behalf of the account holders and had documentation in its possession
22  verifying the same and Namer's position and ownership interests in each of the
23  Customer Companies.  By virtue of those documents and BOA's business dealings
24  and meetings with Namer in the years prior to September 6, 2013, BOA knew that
25  Namer controlled the Customer Companies/account holders and was authorized to
26  act on their behalf under the Deposit Agreement.

27     96. In addition, each of the Deposit Account Documentation Signature Cards
28  provide in relevant part, as follows:

You begin or continue a deposit account relationship with us by giving us information about your business and by signing this Agreement.  The deposit agreement we give you is part of your agreement with us regarding your use of your account and tells you the current terms governing your account.  We may change the deposit agreement at any time and will inform you of changes that affect your rights and obligations.  By signing below, you acknowledge receipt of the deposit agreement.  The deposit agreement includes a provision for alternative dispute resolution.

By signing below, you authorize each person who has signed in the *Designated Account Signers* section below to operate any account opened under this signature card now or in the future.  The authority to operate an account includes: authority to sign checks, and other items, including by electronic signature, electronic records or other electronic form, to withdraw funds to endorse and deposit checks, and other items payable or belonging to you to the account; and to transact other administrative business, including by electronic signature, electronic record, or other electronic form, relating to the account, including closing the account.  If you wish to restrict a designated signer's authority to check signing you must indicate that by checking the box to the left of their name.  We may rely on this authorization for any account opened under this signature card until we receive written notice revoking the authorization at the office where we maintain the account and we have a reasonable tome to act upon such notice.

97. Neither Eisman nor Lahlou signed their names in the *Designated Account Signers* section of the Deposit Account Documentation Signature Cards.  As such, neither Eisman nor Lahlou were authorized to operate any account by virtue of those cards.

98. The Deposit Account Documentation Signature Cards do not authorize any person who has signed the card in the Designated Account Signers section to **remove** another authorized account signer from the account.

99. Further, when Namer opened the Customer Company Accounts, BOA verbally agreed that Lahlou's authority to act on behalf of the account holders was

restricted writing checks on behalf of the account holders in the event that Namer was not available to do so as a matter of convenience, thereby orally modifying the written terms of the Deposit Agreement and restricting Lahlou's authority as an authorized signer.  As a consequence, Lahlou never had the authority to remove Namer as an authorized signer from the Customer Company Accounts. As such, only Namer had the authority to remove himself as an authorized signer on the Customer Company Accounts. BOA knew this.

100.  The Corporate Plaintiffs performed all of their duties and obligations as account holders under the terms of the Deposit Agreement, except for those duties and obligations that were excused.

101.  BOA breached the terms of the Deposit Agreement by, among other things, following the instructions of Lahlou, who was not an account holder and who's authority as an authorized signer was restricted to writing checks, to remove Namer as an authorized signer from the Customer Company Accounts, following the instructions of Eisman, who was not an account holder or an authorized signer on any of the Customer Company Accounts, to remove Namer as an authorized signer on the Customer Company Accounts, following Eisman's directive to not allow Namer's name to be added back onto the Customer Company Accounts, and refusing the instructions of Namer, who controlled the account holders and who was an authorized signer, with regard to the Customer Company Accounts, to add his name back onto the accounts and that he be permitted to borrow funds against those accounts for the use and benefit of the Customer Companies.

102. As a direct and proximate result of BOA's breaches of the Deposit Agreement, IAR, BMIS, and AAPD suffered foreseeable general and consequential damages in an amount according to proof at trial.

///

///

///

## SECOND CLAIM FOR AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY
### (By All Plaintiffs Against BOA and DOES 1-100)

103. Plaintiffs incorporate and reallege paragraphs 1 through 102 above and paragraphs 112 through 126 below, as though fully set forth in this Claim.

104. As an owner, officer, and/or director of the Customer Companies as alleged above, Lahlou owed fiduciary duties to each of those companies and to Namer.  Lahlou represented to BOA that she was an owner, officer, and/or director of and in control of the Customer Companies as part of her scheme with Eisman to take control of the Customer Companies thereby putting BOA on notice that Lahlou owed fiduciary duties to such Customer Companies and to Namer.

105. Lahlou breached those fiduciary duties by scheming with Eisman to surreptitiously and unilaterally remove Namer as an officer and director of the Customer Companies, so that they could seize control of the Customer Companies, and by removing Namer as an authorized signer on the Customer Company Accounts so that they could steal the funds in those accounts.

106.  On information and belief, even if Lahlou was authorized to remove Namer as an authorized signer from the Customer Company Accounts (which she was not), it is highly unusual set of circumstances that Lahlou, who had no or virtually no business dealings with BOA regarding the Customer Company Accounts prior to September 6, 2013, would suddenly and out of the blue, request that Namer be removed as an authorized signer from all twelve Customer Company Accounts all at once, especially considering that BOA knew that Namer was the president and CEO of the Customer Companies  and had dealt with him almost exclusively with respect to the Customer Company Accounts for years prior to September 6, 2013.  On information and belief, it is even more unusual for BOA to receive those instructions from Eisman, who BOA knew was not an account

THIRD AMENDED COMPLAINT

holder or an authorized signer on any of the Customer Company Accounts, and from Eisman's daughter, who BOA knew was not an account holder for any of those accounts and that her signing authority has been restricted to writing checks for the Customer Companies in the event Namer was unable to write them. As alleged above, BOA knew that neither Eisman nor Lahlou were authorized to remove Namer as an authorized signer on the Customer Accounts, yet they were the ones who requested Namer be removed from those accounts.  On information and belief, these facts at a minimum, fell outside the ordinary course of business concerning the Customer Company Accounts and constitute more than merely suspicious or irregular activity with regard to those accounts.  As such, BOA was not entitled to assume that Lahlhou had any legitimate business purpose in removing Namer as an authorized signer from any of the Customer Company Accounts.  BOA should have, at the very least, notified Namer that Eisman and Lahlou had requested that he be removed as an authorized signer from the accounts prior to removing Namer from those accounts.

107.  On information and belief, by virtue of the facts that BOA knew that neither Eisman nor Lahlou were authorized to remove Namer as an authorized signer from the Customer Company Accounts, yet they were the ones that made a highly unusual request to remove Namer as an authorized signer from all twelve accounts all at once, BOA knew that Eisman and Lahlou were engaging in wrongful activity to remove Namer as an authorized signer from and steal the funds in the Customer Company Accounts.  Not only did BOA not notify Namer of Eisman's and Lahlou's wrongful scheme, on information and belief, BOA actively and knowingly assisted Eisman and Lahlou in carrying out their wrongful scheme by, among other things, Schwartz following Eisman's instructions to remove Namer as an authorized signer. In addition, Schwartz told Namer that Namer would not be removed as an authorized signer knowing that that statement was false, in order to as to keep Namer from taking action that he otherwise could have

THIRD AMENDED COMPLAINT

1  taken to keep Eisman and Lahlou from draining the Corporate Plaintiffs' bank

2  accounts. BOA also violated its own policies, favored Lahlou over Namer, and

3  refused Namer's lawful and reasonable demand to freeze the subject accounts.

4  Such actions by BOA are atypical banking procedures.  The fact that BOA

5  followed the instructions of Eisman, who could not by any reasonably objective

6  standard have had any legitimate business purpose in instructing BOA to remove

7  Namer as an authorized signer on the subject accounts, by itself demonstrates that

8  BOA aided and abetted Eisman and Lahlou in their wrongful conduct and scheme

9  to steal corporate funds.

10      108.  On information and belief, without BOA's knowing and active

11  participation in Eisman's and Lahlou's scheme, Eisman and Lahlhou would not

12  have been able to lock Namer out of the Customer Company Accounts and drain

13  those accounts.  Plaintiffs are further informed and believe that, but for BOA

14  aiding and abetting Eisman and Lahlou in their wrongful conduct, Namer would

15  not have been removed as an authorized signer and could have taken immediate

16  action to stop Eisman and Lahlou from damaging the Customer Companies.

17      109.  As a direct and proximate result of BOA's actions as alleged herein,

18  Plaintiffs suffered foreseeable general and consequential damages according to

19  proof at trial.

20      110.  BOA's conduct as alleged herein was fraudulent, oppressive, and

21  malicious and designed to harm Plaintiffs.  As such Plaintiffs are entitled to an

22  award of punitive damages to punish BOA for its wrongful conduct and to deter

23  BOA from committing the same or similar wrongful acts in the future.

### THIRD CLAIM FOR BREACH OF FIDUCIARY DUTY

### (By IAR, BMIS, and AAPD Against BOA and DOES 1-100)

26      111.  The Corporate Plaintiffs incorporate and reallege paragraphs 1 through

27  110 above and paragraphs 118 through 126 below, as though fully set forth in this

28  Claim.

112.  On September 9, 2013, Namer notified Schwartz, the Vice President/Client Manager of BOA's branch in San Diego that Namer had learned of Eisman's and Lahlou's unlawful and fraudulent takeover of the Customer Companies and directed Schwartz  to freeze all of the Customer Company accounts  until a court order could be issued.  In response to Namer's request, even though Schwartz had no obligation to do so, Schwartz assured Namer that Namer would not be removed as a signatory from any of the Customer Company accounts and that the dispute with Lahlou was a matter for the courts to decide.  In giving those assurances, BOA knowingly agreed to act on behalf and for the benefit of the Corporate Plaintiffs.

113.  Schwartz's assurances gave Namer the impression that the monies in the Customer Company accounts were safe and that Schwartz would not allow the accounts to be depleted by Eisman or Lahlou until the matters was decided by the courts.  Namer had dealt with Schwartz on many occasions prior to September 9, 2013, concerning the business of the Customer Companies.  Never, in any of those dealings, did Schwartz ever lie to Namer or do anything that would make Namer mistrust him.  As a result, Namer had no reason not to trust Schwartz and had no reason to believe that Schwartz's September 9, 2013 assurances were untrue.  Therefore, Namer reposed his trust and confidence in Schwartz's assurances that the money in Customer Company accounts were safe and that Schwartz would not allow Lahlou or Eisman to deplete those accounts without a court order.  These facts gave rise to a fiduciary relationship between BOA and the Corporate Plaintiffs.

114.  At the time Schwartz gave those assurances, Namer was still legally an authorized signer on the accounts (even if BOA had removed his name from those accounts), because neither Eisman nor Lahlou had the authority to remove him from those accounts, and  because BOA's actions in following the instructions of

Eisman and Lahlou to remove him from those accounts violated the terms of the Deposit Agreement as alleged above.

115.  BOA breached its fiduciary duties owed to the Corporate Plaintiffs by removing Namer as an authorized signer on the Corporate Plaintiff's accounts, contrary to Schwartz's assurances, refusing Namer's request to be reinstated as a signatory so he could protect and preserve the Corporate Plaintiff's funds and assets, and allowing Eisman and Lahlou to drain the Corporate Plaintiffs' accounts and diminish the value of their assets.

116.  As a direct and proximate result of BOA's actions as alleged herein, the Corporate Plaintiffs suffered foreseeable general and consequential damages according to proof at trial.

117.  BOA's conduct as alleged herein was fraudulent, oppressive, and malicious and designed to harm Plaintiffs.  As such the Corporate Plaintiffs are entitled to an award of punitive damages to punish BOA for its wrongful conduct and to deter BOA from committing the same or similar wrongful acts in the future.

**FOURTH CLAIM FOR AIDING AND ABETTING CONVERSION**

**(By IAR, BMIS, and AAPD Against BOA and DOES 1-100)**

118. The Corporate Plaintiffs incorporate and reallege paragraphs 1 through 117 above, as though fully set forth in this Claim.

119.  After September 9, 2013, the balance of IAR's BOA account no. XXXXXX6318 was $309,064.54.  This sum was an asset and the property of IAR.

120.   After September 9, 2013, the balance of BMIS's BOA account no. XXXXXX9178 was $122,891. This sum was an asset and the property of BMIS.

121.   After September 9, 2013, the balance of AAPD's BOA account no. XXXXXX9173 was $5,641. This sum was an asset and the property of AAPD.

122.  On September 9, 2013, Namer notified Schwartz, the Vice President/Client Manager of BOA's branch in San Diego that there had been a hostile and fraudulent takeover of the Customer Companies by Lahlou and directed

THIRD AMENDED COMPLAINT

Schwartz to freeze all of the Customer Company accounts until a court order could be issued. Upon receipt of Namer's directive, BOA was obligated to follow that directive. Schwartz led Namer to believe that BOA would follow that directive by assuring Namer that Namer would not be removed as a signatory from any of the Customer Company accounts and that the dispute with Lahlou was a matter for the courts to decide. Schwartz's assurances gave Namer a false impression that the monies in the Customer Company accounts were safe and that Schwartz would not allow the accounts to be depleted by Lahlou until the matters was decided by the courts. Namer had dealt with Schwartz on many occasions prior to September 9, 2013, concerning the business of the Customer Companies and had no reason not to trust Schwartz and had no reason to believe that Schwartz's assurances were untrue. Therefore, Namer reposed his trust in Schwartz's representations and assurances that the money in Customer Company accounts were safe and that Schwartz would not allow Lahlou to deplete those accounts without a court order.

123.     By assuring Namer that he would not be removed as a signatory from the Customer Company accounts and that the money in those accounts were safe, thereby causing Namer to repose his trust and confidence in Schwartz, BOA's assumed the fiduciary duties of a trustee towards the Customer Companies and was no longer a mere debtor with regard to the Customer Company accounts. As further consequence of BOA's assurances and agreement to not allow Lahlou deplete the Customer Company accounts, those accounts were no longer merely deposit accounts, as the funds in those accounts were now being held in trust by BOA, pending an order from the court. As such, BOA did not have title to the funds in those accounts and/or had assumed the duty to protect them.

124. Notwithstanding the foregoing, after September 9, 2013, BOA knowingly aided and abetted Lahlou in converting the specific identified funds alleged above held in the Customer Company accounts by allowing Lahlou to withdraw those sums from those accounts, while at the same time refusing Namer's request to

1  freeze those accounts and restore him as a signatory to those accounts.  As a result,

2  Namer was unable to stop Lahlou from depleted and converting the funds in those

3  accounts.

4      125.  As a direct and proximate result of BOA's actions as alleged herein,

5  Plaintiffs IAR, BMIS, and AAPD suffered foreseeable general and consequential

6  damages according to proof at trial.

7      126.  BOA's conduct as alleged herein was fraudulent, oppressive, and

8  malicious and designed to harm the Corporate Plaintiffs.  As such Plaintiffs are

9  entitled to an award of punitive damages to punish BOA for its wrongful conduct

10  and to deter BOA from committing the same or similar wrongful acts in the future.

11      WHEREFORE, Plaintiffs pray as follows:

12      1.      For general damages according to proof at trial;

13      2.      For consequential damages according to proof at trial;

14      3.      For punitive damages according to proof at trial;

15      4.      For a trial by jury for all issues so triable; and

16      5.      For such other and further relief as the Court may deem just and

17  proper.

18  Dated:  June 9, 2017                    GREGOR LAW OFFICES

19

20                                  By:___/s/T. Steven Gregor_____

21                                      T. STEVEN GREGOR

22                                      Attorneys for Plaintiff,
                                        ROBERT NAMER, IAR
23                                      COMPANY, BUSINESS
                                        MANAGEMENT INFORMATION
24                                      SYSTEM, INC., and AMERICAN
                                        ACADEMY OF POOL
25                                      DESIGNERS, INC.

26

27

28

THIRD AMENDED COMPLAINT